1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MONIQUE DEBBS,

11              Plaintiff,                    No. 2:11-cv-02394 KJN

12        vs.

13
     MICHAEL J. ASTRUE,
14   Commissioner of Social Security,

15              Defendant.                    ORDER
     _____/

16

17              Plaintiff, who is represented by counsel, seeks judicial review of a final decision

18   of the Commissioner of Social Security ("Commissioner") denying her applications for

19   Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II

20   and XVI, respectively, of the Social Security Act ("Act").[1]  In her motion for summary

21   judgment, plaintiff contends that the administrative law judge ("ALJ") erred by: (1) improperly

22   evaluating the opinions from the treating and examining sources; (2) failing to find that

23   plaintiff's impairments in combination meet or equal the criteria of one or more listed

24   _____

25        [1]  This case was referred to the undersigned pursuant to E.D. Cal. L.R. 302(c)(15) and
     28 U.S.C. § 636(c), and both parties voluntarily consented to proceed before a United States
26   Magistrate Judge.  (Dkt. Nos. 7, 11.)

                                              1

impairments; and (3) improperly determining plaintiff's residual functional capacity ("RFC"). (Pl.'s Mot. for Summ. J. at 15-29, Dkt. No. 15.)  Additionally, plaintiff argues that the Social Security Administration's Appeals Council erred by failing to remand the case based on the additional medical evidence submitted to the Appeals Council after the ALJ's decision.  (Id. at 16.)  The Commissioner filed an opposition to plaintiff's motion and a cross-motion for summary judgment.  (Dkt. No. 16.)  For the reasons stated below, the court denies plaintiff's motion for summary judgment and grants the Commissioner's cross-motion for summary judgment.

I.      BACKGROUND[2]

        A.      Procedural Background

                Plaintiff filed an application for DIB on June 19, 2007, and an application for SSI on June 28, 2007, alleging a disability onset date of December 28, 2006, in both applications. (Administrative Transcript ("AT") 17, 102-12.)  The Social Security Administration denied both claims, initially on February 1, 2008, and upon reconsideration on October 2, 2008.  (AT 17.) On November 10, 2008, plaintiff filed a request for a hearing before an ALJ, which was conducted on September 8, 2009.  (Id.)  Plaintiff, who was represented by counsel, was the only person to give testimony at the hearing.  (AT 31-47.)

                In a decision dated December 30, 2009, the ALJ determined that plaintiff was not disabled, for purposes of the Act, from December 28, 2006, through the date of the ALJ's decision.[3]  (AT 17-26.)  The ALJ's decision became the final decision of the Commissioner

---

        [2]  Because the parties are familiar with the factual background of this case, including plaintiff's medical history, the undersigned does not exhaustively relate those facts herein.  The facts related to plaintiff's impairments and medical history will be addressed only insofar as they are relevant to the issues presented by the parties' respective motions.

        [3]  Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. §§ 401 et seq.  Supplemental Security Income ("SSI") is paid to disabled persons with low income.  42 U.S.C. §§ 1382 et seq.  Under both provisions, disability is defined, in part, as an "inability to engage in any substantial gainful activity" due to

1  when the Appeals Council denied plaintiff's request for review.  (AT 1-3.)  This action for

2  judicial review ensued.

3        B.      Summary of the ALJ's Findings

4              The ALJ conducted the required five-step evaluation and concluded that plaintiff

5  was not disabled within the meaning of the Act.  At step one, the ALJ concluded that plaintiff

6  had not engaged in substantial gainful activity since December 28, 2006, the alleged onset date.

7  (AT 19.)  At step two, the ALJ concluded that plaintiff had the following "severe" impairments:

8  depression, bipolar disorder, and schizophrenia.  (Id.)  At step three, the ALJ determined that

9  plaintiff's impairments, whether considered alone or in combination, did not meet or medically

10 equal any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  (AT

11 19-20.)

12 _____

13 "a medically determinable physical or mental impairment."  42 U.S.C. §§ 423(d)(1)(a) &
   1382c(a)(3)(A).  A five-step sequential evaluation governs eligibility for benefits.  See 20 C.F.R.

14 §§ 423(d)(1)(a), 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).  The
   following summarizes the sequential evaluation:

15
              Step one:  Is the claimant engaging in substantial gainful
16       activity?  If so, the claimant is found not disabled.  If not, proceed
         to step two.
17            Step two:  Does the claimant have a "severe" impairment?
         If so, proceed to step three.  If not, then a finding of not disabled is
18       appropriate.
              Step three:  Does the claimant's impairment or combination
19       of impairments meet or equal an impairment listed in 20 C.F.R., Pt.
         404, Subpt. P, App.1?  If so, the claimant is automatically
20       determined disabled.  If not, proceed to step four.
              Step four:  Is the claimant capable of performing his past
21       work?  If so, the claimant is not disabled.  If not, proceed to step
         five.
22            Step five:  Does the claimant have the residual functional
         capacity to perform any other work?  If so, the claimant is not
23       disabled.  If not, the claimant is disabled.

24 Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

25       The claimant bears the burden of proof in the first four steps of the sequential evaluation
   process.  Bowen, 482 U.S. at 146 n.5.  The Commissioner bears the burden if the sequential
26 evaluation process proceeds to step five.  Id.

1    The ALJ further determined that plaintiff had the RFC to "perform a full range of

2    work at all exertional levels," but that she also had non-exertional limitations that limited her to

3    performing "simple unskilled work and detailed work." (AT 21.)  In making this determination,

4    the ALJ considered an RFC assessment of plaintiff conducted by Dr. John Onate, plaintiff's

5    treating primary care provider, but accorded "little weight" to Dr. Onate's opinion. (AT 24-25.)

6    Instead, the ALJ gave substantial weight to the opinions of two consultative examining

7    psychologists, Drs. Lisa Perrine and Silvia Torrez, which the ALJ found to contradict Dr.

8    Onate's more severe assessment. (AT 25.)

9    At step four, the ALJ found that plaintiff was capable of performing her past work

10   as a fast food restaurant worker and telemarketer given her RFC. (AT 22, 25.)  In addition, the

11   ALJ determined that, given plaintiff's "age, education, work experience, and [RFC]," there were

12   other jobs that exist in significant numbers in the national economy that plaintiff could also

13   perform. (AT 25.)

14   II.    STANDARDS OF REVIEW

15   The court reviews the Commissioner's decision to determine whether (1) it is

16   based on proper legal standards under 42 U.S.C. § 405(g), and (2) substantial evidence in the

17   record as a whole supports it.  Copeland v. Bowen, 861 F.2d 536, 538 (9th Cir. 1988) (citing

18   Desrosiers v. Secretary of Health and Human Services, 846 F.2d 573, 575-76 (9th Cir. 1988)).

19   Substantial evidence means more than a mere scintilla of evidence, but less than a

20   preponderance.  Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996) (citing Sorenson v.

21   Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975)).  "It means such relevant evidence as a

22   reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales,

23   402 U.S. 389, 402 (1971) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229

24   (1938).  The record as a whole must be considered, Howard v. Heckler, 782 F.2d 1484, 1487

25   (9th Cir. 1986), and both the evidence that supports and the evidence that detracts from the

26   ALJ's conclusion weighed.  See Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court

1  may not affirm the ALJ's decision simply by isolating a specific quantum of supporting

2  evidence.  Id.; see also Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial

3  evidence supports the administrative findings, or if there is conflicting evidence supporting a

4  finding of either disability or nondisability, the finding of the ALJ is conclusive, see Sprague v.

5  Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987), and may be set aside only if an improper legal

6  standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338

7  (9th Cir. 1988).

8  III.    DISCUSSION

9        A.    Whether The ALJ Improperly Evaluated The Opinion Evidence Concerning

10           Plaintiff's Mental Health Impairments

11       Plaintiff argues that the ALJ erred by giving "little weight" to the opinion of

12 Dr. Onate, plaintiff's primary care treating physician, and instead relying on the opinions of two

13 consultative examining psychologists, Drs. Perrine and Torrez, to determine that plaintiff was

14 not disabled.  (Pl.'s Mot. for Summ. J. 26-29.)  Defendant asserts that the ALJ properly

15 evaluated these opinions as he did, because Dr. Onate's assessment "was inconsistent with all of

16 the other opinions in the record" and "with Plaintiff's treatment records which indicated that her

17 symptoms were generally fair or better and controlled by medication."  (Def.'s Cross-Mot. for

18 Summ. J. 8.)

19       The weight given to medical opinions depends in part on whether they are

20 proffered by treating, examining, or non-examining professionals.  Holohan v. Massanari,

21 246 F.3d 1195, 1201-02 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).

22 Ordinarily, more weight is given to the opinion of a treating professional, who has a greater

23 opportunity to know and observe the patient as an individual.  Id.; Smolen v. Chater, 80 F.3d

24 1273, 1285 (9th Cir. 1996).

25       To evaluate whether an ALJ properly rejected a medical opinion, in addition to

26 considering its source, the court considers whether (1) contradictory opinions are in the record;

1  and (2) clinical findings support the opinions.  An ALJ may reject an uncontradicted opinion of a

2  treating or examining medical professional only for "clear and convincing" reasons.  Lester,

3  81 F.3d at 830-31.  In contrast, a contradicted opinion of a treating or examining professional

4  may be rejected for "specific and legitimate" reasons.  Lester, 81 F.3d at 830.  While a treating

5  professional's opinion generally is accorded superior weight, if it is contradicted by a supported

6  examining professional's opinion (supported by different independent clinical findings), the ALJ

7  may resolve the conflict.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing

8  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to

9  weigh the contradicted treating physician opinion, Edlund v. Massanari, 253 F.3d 1152, 1157

10 (9th Cir. 2001),[4] except that the ALJ in any event need not give it any weight if it is conclusory

11 and supported by minimal clinical findings.  Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir.

12 1999) (treating physician's conclusory, minimally supported opinion rejected); see also

13 Magallanes, 881 F.2d at 751.  The opinion of a non-examining professional, without other

14 evidence, is insufficient to reject the opinion of a treating or examining professional.  Lester,

15 81 F.3d at 831.

16        Here, the ALJ accorded "little weight" to Dr. Onate's August 24, 2009 opinion

17 that plaintiff has a fair-to-poor ability to perform work-related activities in a regular work setting

18 due to her mental impairments.  (AT 24-25, 380.)  The ALJ's stated reasons for giving this

19 opinion "little weight" were:

20        [Dr. Onate's] findings are not consistent with the record and there are no
          objective findings to support his assessment.  During consultative

21        examination, claimant's GAF was assessed as 60, denoting mild to
          moderate symptoms.  Her statements during examinations that she goes to

22        the store daily, is able to take public transportation, would like to go to
          school and enjoys crossword puzzles and watching television programs do

23        not support the restrictive limitations assessed by Dr. Onate.  Further,
          during evaluation, Dr. Perrine opined that due to malingering, the test

24

25        [4]  The factors include: (1) length of the treatment relationship; (2) frequency of
examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis;

26 (5) consistency; and (6) specialization.  20 C.F.R. § 404.1527.

results were of questionable validity and did not reflect the claimant's true level of functioning.  Dr. Torrez stated that the claimant does not appear to be suffering from a major mental disorder and appears to function adequately.

(AT 25.)  In essence, the ALJ found that Dr. Onate's opinion was contradicted by the examining psychologists' opinions and the weight of the treatment records, which ordinarily constitute substantial evidence for an ALJ to reject or accord diminished weight to a treating provider's opinion.  See Andrews, 53 F.3d at 1041 (citing Magallanes, 881 F.2d at 751, 755) ("Where the opinion of the claimant's treating physician is contradicted, and the opinion of a nontreating source is based on independent clinical findings that differ from those of the treating physician, the opinion of the nontreating source may itself be substantial evidence; it is then solely the province of the ALJ to resolve the conflict").

Nevertheless, plaintiff contends that the ALJ improperly relied on the opinions of Drs. Perrine and Torrez in reaching his determination that plaintiff is not disabled, because these opinions, for various reasons, do not constitute substantial evidence.  (Pl.'s Mot. for Summ. J. 26-29.)  Plaintiff's argument is not well taken.

1.    Dr. Perrine's Opinion

On January 11, 2008, plaintiff underwent a consultative mental health evaluation by psychologist Dr. Perrine.  (AT 270-74.)  During this evaluation, Dr. Perrine interviewed plaintiff, reviewed plaintiff's prior treatment records, and performed a battery of tests to assess plaintiff's general mental status, intellectual functioning, ability to concentrate, and motor skills.  (AT 270, 272-74.)

Dr. Perrine noted that plaintiff was raised by her grandmother until the age of sixteen, when her grandmother died and plaintiff started experiencing chronic depression and anxiety.  (AT 270, 272.)  As for schooling, plaintiff was never enrolled in special education classes and left high school in the eleventh grade, but received her GED in 2007 and attended American River College for a semester.  (Id.)  With respect to plaintiff's work history,

Dr. Perrine observed that plaintiff "has been employed in child care, fast food, and telemarketing," with her longest employment period occurring in 2006 when she worked for Taco Bell. (AT 271.) Dr. Perrine also observed that plaintiff had some history of marijuana and cocaine use, but that she had been clean and sober for about six months. (AT 271, 274.) Plaintiff reported to Dr. Perrine that she had been hospitalized in 2007 on a voluntary hold "for suicidality, anxiety, depression, and episodic crying." (AT 272.) Plaintiff further claimed that she would experience auditory hallucinations when she felt stressed. (Id.) However, she also told Dr. Perrine that she had been taking Busiprone, Tegretol, Zyprexa, and Celexa for the past five months and that "it helped." (Id.) With respect to plaintiff's current activities, Dr. Perrine noted that plaintiff generally spends her day watching TV, participating in an anger management class, doing crossword puzzles, and walking to the store for cigarettes. (Id.)

Dr. Perrine also conducted her own independent assessment of plaintiff, utilizing several testing procedures that evaluated plaintiff's intellectual, memory, and visual-motor functioning. (AT 270.) Based on her examination, Dr. Perrine found that:

> The examinee was alert and fully oriented. Speech was clear, slow, and soft. Conversation was coherent with no evidence of formal thought disorder (despite her report mid-interview that she was hearing voices). Mood was described as depressed and affect blunted. Attention and concentration were good. Comprehension within normal limits resulting in good ability to carry out both simple and complex instructions. Recent memory was mildly impaired while remote memory functioning was moderately impaired. Judgment was fair and insight poor.

(AT 272.) Additionally, Dr. Perrine observed that plaintiff appeared neatly dressed, had a normal posture and gait, and made "no abnormal involuntary movements." (Id.) Moreover, she noted that plaintiff was able to read and write, made good eye contact during the interview, and exhibited "deliberate and neat" work habits. (Id.)

Dr. Perrine found that plaintiff's performance on many of the tests that she administered was exceedingly poor, such as plaintiff's overall IQ score of 72, placing plaintiff's "performance in the borderline range of intellectual functioning." (AT 273-74.) However,

Dr. Perrine opined that these poor results were "of questionable validity and likely do not reflect [plaintiff's] current level of cognitive functioning." (AT 272.) Her reasons for this determination were that plaintiff "did not put forward an adequate effort" when taking the exams and, in particular, that her memory functioning test results were "far worse than could reasonably be expected given her history and complaints and not at all consistent with results on another test (Digit Span) that utilizes memory functioning." (AT 274.) Dr. Perrine also noted that during the examination plaintiff "often seemed blase and uninvolved in the testing procedures, unmotivated to correct errors or do more than the bare minimum, and did not make an adequate effort to demonstrate her current abilities." (AT 272.) She further opined that plaintiff's "true level of [intellectual] functioning is likely in the low average range" and that "[t]here was no indication that emotional problems such as depression or anxiety might have interfered with her test results." (AT 273.)

As noted above, a consultative evaluation that is based on independent clinical findings and that contradicts a treating provider's opinion, such as Dr. Perrine's examination of plaintiff, may constitute substantial evidence to justify an ALJ's rejection of the treating provider's opinion. Andrews, 53 F.3d at 1041 (citing Magallanes, 881 F.2d at 751). Plaintiff, however, makes three arguments as to why the ALJ's reliance on Dr. Perrine's opinion was in error.

First, plaintiff emphasizes that Dr. Perrine only examined plaintiff on one occasion for a short period of time. (Pl.'s Mot. for Summ. J. 26-27.) However, the fact that a consultative examining provider saw a claimant on only one occasion is not in itself sufficient to disqualify the examiner's opinion; the very nature of a consultative examination generally limits an examining provider to a single opportunity to assess a claimant. See 20 C.F.R. § 404.1519.

////

////

////

1  In developing her opinion, Dr. Perrine conducted a thorough examination, resulting in

2  independent clinical findings, and reviewed plaintiff's prior records.[5]

3         Second, plaintiff argues that her performance on the tests administered by

4  Dr. Perrine actually support a finding that plaintiff is disabled.  (Pl.'s Mot. for Summ. J. 27.)

5  This interpretation, of course, contradicts Dr. Perrine's professional opinion that these results do

6  not accurately reflect plaintiff's actual capabilities.  (See AT 273-74.)  Dr. Perrine explained her

7  conclusion by stating that plaintiff had not put forth an adequate effort to demonstrate her actual

8  capabilities.  She based this determination on the records before her, plaintiff's behavior, her

9  personal examination of plaintiff, and her clinical expertise as a psychologist.  Indeed, plaintiff's

10 performance on the consultative examination plausibly suggests malingering – for example,

11 apart from her behavioral observations, Dr. Perrine noted that plaintiff's test results regarding

12 her memory functioning were inconsistent with results from her Digit Span test, which also

13 tested memory functioning skills.  (Id.)

14        After reviewing and considering all of the evidence before him, the ALJ agreed

15 with Dr. Perrine's interpretation of those results.  (See AT 25.)  One of the ALJ's stated reasons

16 for according "little weight" to Dr. Onate's opinion was that "Dr. Perrine opined that due to

17 malingering, the test results were of questionable validity and did not reflect the claimant's true

18 level of functioning."  (Id.)  While Dr. Perrine's interpretation may not be the only one, it was

19 reasonable and the ALJ was entitled to rely on her psychological expertise.  Sprague, 812 F.2d at

20 1230 ("The general rule is that conflicts in the evidence are to be resolved by the Secretary . . .

21 ////

22

23        [5]  Additionally, plaintiff's criticism of Dr. Perrine's opinion on that basis is equally
   applicable to treating physician Dr. Onate, who based his functional capacity assessment solely
24 on his initial consultation with plaintiff on August 24, 2009.  (See AT 380-81.)  The additional
   treatment records from Dr. Onate submitted to the Appeals Council contain a few subsequent
25 treatment notes made by Dr. Onate; however, the only treatment record that predates Dr. Onate's
   functional assessment was an intake record prepared by another person at the Primary Care
26 Clinic with which Dr. Onate was affiliated.  (AT 388.)

1 and that the Secretary's conclusion must be upheld where there is more than one rational

2 interpretation of the evidence").

3          Finally, plaintiff contends that the ALJ gave disproportionate consideration to

4 Dr. Perrine's opinion, because Dr. Perrine only "had limited medical records and failed to

5 consider any records other than those 'provided by the Disability Evaluation Division' prior to

6 1/11/08." (Pl's Mot. for Summ J. 27.)  As an initial matter, the mere fact that further medical

7 records were generated after a consultative examiner's assessment does not per se disqualify the

8 examiner's opinion.  Because consultative examiners can only review the records reasonably

9 available at the time of the assessment, plaintiff's interpretation would lead to disqualification of

10 virtually every consultative examiner's opinion in every case.  In any event, the ALJ did not rely

11 solely on Dr. Perrine's opinion, but also considered consultative psychologist Dr. Torrez's

12 opinion and plaintiff's treatment records, which, as discussed below, were generally consistent

13 with Dr. Perrine's opinion.

14               2.      Dr. Torrez's Opinion and the Other Treatment Records

15          The ALJ also relied on the opinion of Dr. Torrez, another consultative examining

16 psychologist, as a reason for according Dr. Onate's opinion "little weight." (AT 25.)  Dr. Torrez

17 performed a comprehensive mental health evaluation of plaintiff on August 31, 2008.  (AT

18 312-17.)  During this examination, Dr. Torrez observed that plaintiff's speech, thought content,

19 concentration, and judgment abilities were within normal limits and that "[t]here were no

20 indications of hallucinations or delusions." (AT 315-16.)  She also noted that plaintiff was

21 well-dressed, had a pleasant attitude, and made fair eye contact.  (AT 315.)  While Dr. Torrez

22 found that plaintiff's mood and affect were dysphoric, plaintiff denied any notions of suicide.

23 (Id.)  With respect to plaintiff's speech, Dr. Torrez noted that it was logical, coherent, concise,

24 and clearly articulated.  (Id.)  Dr. Torrez further found that plaintiff's level of intellectual

25 function was consistent with her education level as she "had no difficulty identifying three

26 presidents of the United States and the capitol and governor of California correctly" and could

11

1   correctly answer other simple questions.  (Id.)  With respect to intellectual functioning,

2   Dr. Torrez stated that plaintiff had an average intellect, an intact recent and remote memory, and

3   the ability to conduct abstract thinking within normal limits.  (AT 315-16.)

4         Dr. Torrez diagnosed plaintiff with cocaine dependence in early remission,

5   cannabis and alcohol dependence in early partial remission, an unspecified depressive disorder,

6   and a GAF score of 60.[6]  (AT 316.)  Dr. Torrez opined that "[d]espite claimant's reported

7   symptoms and history, she does not appear to be suffering from a major mental disorder at this

8   time."  (AT 317.)  She further found that plaintiff's "symptom severity was considered to be

9   within the mild to moderate range."  (AT 316.)  Dr. Torrez also assessed plaintiff as having a fair

10  ability to perform a number of work-related tasks such as remembering instructions, maintaining

11  concentration, interacting with coworkers, and dealing with changes in a work setting.  (Id.)

12  Additionally, Dr. Torrez found that there was a minimal likelihood of plaintiff emotionally

13  deteriorating in the work environment.  (Id.)

14        Plaintiff argues that the ALJ erroneously relied on Dr. Torrez's opinion, because

15  Dr. Torrez did not review plaintiff's prior treatment records when conducting her evaluation.

16  (Pl.'s Mot. for Summ. J. 28-29.)  Generally, the regulations require that a consultative examiner

17  be given any necessary background information about the plaintiff's condition.  20 C.F.R.

18  § 404.1517.  Background information is essential because consultative examinations are used to

19  resolve inconsistencies or ambiguities in the evidence.  20 C.F.R. § 404.1519a(b).  In a mental

20  impairment case, a plaintiff's prior treatment records are even more important than in a case

21  involving a physical impairment, which is usually more easily visible to the examining

22  ////

23

---

24      [6] GAF is a scale reflecting "psychological, social, and occupational functioning on a
     hypothetical continuum of mental health-illness."  Diagnostic and Statistical Manual of Mental
25   Disorders 34 (4th ed. 2000).  A GAF score of 51-60 indicates "[m]oderate symptoms (e.g., flat
     affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social,
26   occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  Id.

1    physician.  It is quite often the case that the severity, or even the expression, of mental problems

2    will vary from day to day.

3              Thus, the undersigned agrees that, standing alone, Dr. Torrez's opinion cannot

4    constitute substantial evidence.  Nevertheless, Dr. Torrez's opinion was supported by a thorough

5    examination resulting in independent clinical findings, and the ALJ considered Dr. Torrez's

6    opinion in conjunction with the other evidence and opinions in the record, which were generally

7    consistent with Dr. Torrez's findings.  (AT 21-25.)  Plaintiff's treatment records generally

8    indicate that plaintiff's impairments caused her mild-to-moderate limitations consistent with

9    Drs. Perrine's and Torrez's assessments, rather than the more extreme limitations assessed by

10   Dr. Onate.

11             For example, the treatment records generally indicate that plaintiff's conditions

12   were well-controlled once she started receiving medication.  In June 2007, plaintiff was checked

13   into Sacramento County Mental Health Treatment Center and placed on an involuntary

14   psychiatric hold.  (AT 236.)  While there, plaintiff complained of hearing voices and "depressive

15   feelings, decreased sleep and appetite, increased irritability."  (Id.)  Plaintiff was not taking any

16   medications at the time and stated that "I need medications that will help me with my voices and

17   anger."  (Id.)  Despite plaintiff's complaints, the doctor noted that plaintiff's speech was normal

18   and that her insight and judgment were fair.  (AT 237.)  Additionally, the doctor recommended

19   reestablishing plaintiff's medications and prescribed Zyprexa.  (AT 239, 241.)

20             After her release from the hospital, plaintiff began receiving treatment services

21   from the Guest House Homeless Services Program ("Guest House"), where she received

22   treatment from August 2007 through May 2008.  (AT 298-311.)  During the course of plaintiff's

23   treatment at Guest House, her medications and dosages were changed several times and the

24   examiners generally observed a steady improvement in plaintiff's mood and overall condition.

25   (See AT 298-305.)  Plaintiff was last examined at Guest House on May 14, 2008, by Licensed

26   Psychiatric Technician ("L.P.T.") Scales, who noted that plaintiff "continues with some mild

13

depression, however, feels stable on her current medications." (AT 305.) Plaintiff also received

treatment at El Hogar from June 2008 to January 2009. (AT 352-79.) During that time period,

she was treated by Drs. Franklin and Meer. (AT 363, 366.) During plaintiff's final examination

on January 15, 2009, Dr. Meer noted that plaintiff's current "combination of medication had

worked well for her," causing Dr. Meer to continue plaintiff on the same regimen of medication.

(AT 366.)

        As such, the treatment records indicate that plaintiff's mental impairments were

generally well-controlled by medication, corroborating the relatively mild findings of

Drs. Perrine and Torrez, and plausibly suggesting that plaintiff's symptoms were overall mild to

moderate throughout most of the relevant period.

        Additionally, on September 30, 2008, a non-examining state agency psychiatrist,

Dr. Gottschalk, reviewed plaintiff's prior records and conducted a mental RFC assessment. (AT

318-35.) Dr. Gottschalk opined that plaintiff had insignificant-to-moderate limitations with

respect to understanding and memory, concentration and persistence, social interaction, and

adaptation. (AT 318-19.) Dr. Gottschalk further found that while plaintiff had certain psychotic

features, they were in remission because of the medications she took. (AT 322-23.)

Additionally, Dr. Gottschalk opined that plaintiff's impairments caused only mild restriction in

activities of daily living and moderate difficulties in maintaining social functioning,

concentration, persistence, and pace. (AT 329.) Ultimately, Dr. Gottschalk determined that

plaintiff was mentally able to do at least "1-2 step tasks, not requiring significant, close,

coordinated interactions" and was "able to adapt to change in work routine." (AT 320.) As

such, Dr. Gottschalk's opinion generally comports with the opinions of Drs. Perrine and Torrez,

as well as plaintiff's treatment records.

        Moreover, even setting aside the substantial evidence of the consultative

examining psychologists and the state agency psychiatrist, Dr. Onate's brief, two-page opinion

itself is conclusory, minimally supported, and inconsistent with the weight of plaintiff's

treatment records.  For example, Dr. Onate opined that plaintiff had a fair-to-poor ability to understand instructions and sustain concentration and task persistence.  (AT 380.)  His basis for this assessment was that plaintiff's bipolar disorder caused her difficulty in paying attention. (Id.)  However, the treatment records show that some of plaintiff's other treating physicians noted that plaintiff was attentive, alert, had a normal ability to concentrate, and made good eye contact.  (See, e.g., AT 272, 305-07, 309, 315, 366.)

Indeed, Dr. Onate's opinion contains little in the way of objective clinical findings beyond an ultimate determination that plaintiff has "poor chronic Bipolar [disorder]" and a checklist regarding plaintiff's ability to understand and remember instructions, sustain concentration and task persistence, engage in social interactions, and adapt to changes.  (AT 380-81.)  He also opined that plaintiff had difficulty with attention and emotional control (id.), but did not cite to any objective test results or specific clinical findings that support these conclusions, and did not explain what his "psychiatric evaluation" of plaintiff entailed.  (See id.) As noted in footnote 5, supra, Dr. Onate based his functional capacity assessment solely on a single, initial consultation with plaintiff on August 24, 2009.  (See AT 380-81.)[7]  "The ALJ need not accept an opinion of a physician  – even a treating physician – if it is conclusionary and brief and is unsupported by clinical findings."  Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing Magallanes, 881 F.2d at 747, 751); see also Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (holding that the ALJ properly rejected the opinion of a treating physician because it was "unsupported by rationale or treatment notes, and offered no objective medical findings to support the existence of [the claimant's] alleged conditions"); Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (treating physician's conclusory, minimally supported opinion rejected).

---

[7] Treatment records from subsequent examinations performed by Dr. Onate and his staff were not before the ALJ, but were submitted to the Appeals Council, and are addressed below. (AT 382-89.)

1    Additionally, Dr. Onate's status as a primary health care provider further bolsters

2 the ALJ's reliance on the other specialist opinions from psychologists and a psychiatrist.

3 20 C.F.R. § 404.1527 ("We generally give more weight to the opinion of a specialist about

4 medical issues related to his or her area of specialty than to the opinion of a source who is not a

5 specialist").

6    Accordingly, the undersigned finds that substantial evidence supports the ALJ's

7 evaluation of the opinion evidence.

8 B.    Whether The ALJ Erred In Determining That Plaintiff's Impairments Did Not Meet or

9    Equal A Disability Listing[8]

10    At step three, the ALJ determines whether "a claimant's impairment meets or

11 equals an impairment listed in [20 C.F.R. Part 404, Subpart P, Appendix 1]." Tackett v. Apfel,

12 180 F.3d 1094, 1099 (9th Cir. 1999). The Listing of Impairments describes specific impairments

13 of each of the major body systems "which are considered severe enough to prevent a person

14 from doing any gainful activity." Id. (citing 20 C.F.R. § 404.1525). If a claimant meets or

15 equals a listed impairment he or she will be found disabled at this step without further inquiry.

16 Id. (citing 20 C.F.R. § 404.1520(d)).

17    A claimant bears the burden of proving that her impairments satisfy all the criteria

18 of a particular listing. Sullivan v. Zebley, 493 U.S. 521, 530 (1990) ("[f]or a claimant to show

19

20    [8] Plaintiff also makes an unsupported, one-sentence assertion that the ALJ erred "by
21 failing to find that Plaintiff's Mental Conditions of Bi Polar Disorder and Post Traumatic Stress
Disorder (PTSD) did not constitute [sic] a severe impairment." (Pl.'s Mot. for Summ. J. 15.)
Apparently, plaintiff argues that the ALJ erred at step two by not finding that plaintiff had these
22 two severe impairments. This argument lacks merit. First, the ALJ *did* find that plaintiff's
bipolar disorder constituted a severe impairment at step two. (AT 19.) Additionally, even
23 though the ALJ did not identify PTSD as a severe impairment at step two, the ALJ found that
plaintiff had several other severe mental impairments at step two and continued with the
24 sequential evaluation process, considering all evidence of plaintiff's mental impairments at
subsequent steps. See Burch, 400 F.3d at 682 (holding that the omission of an impairment as a
25 severe impairment at step two did not prejudice claimant because the step was resolved in
claimant's favor). Plaintiff does not identify any specific functional limitations attributable to
26 PTSD that the ALJ failed to consider. Accordingly, any error at step two here was harmless.

that his impairment matches a listing, it must meet *all* of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify") (emphasis in original); Tackett, 180 F.3d at 1099 ("[claimant] had to establish that he met or equaled each of the following characteristics of" a listing).

### 1.   Listing 12.04

In this case, at step three, the ALJ found that plaintiff's "mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listing 12.04," which relates to affective disorders.  (AT 19.)  In particular, the ALJ found that plaintiff failed to satisfy the "B" and "C" criteria of Listing 12.04.

Paragraphs "B" and "C" of Listing 12.04 specify that the impairment, or combination of impairments, must satisfy the following characteristics:

> B. Resulting in at least two of the following:
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration;
>
> OR
>
> C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
> 1. Repeated episodes of decompensation, each of extended duration; or
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.04.  Listing 12.04 requires a claimant to prove that his or her impairments, whether singly or in combination, meet the criteria of both Paragraphs A and B or, alternatively, meet the criteria of Paragraph C.  See id.  Plaintiff contends that the ALJ erred in finding that plaintiff did not meet the B or C criteria.  (Pl.'s Mot. for Summ. J. 18-25.)

1   With respect to whether plaintiff met the criteria listed in Paragraph B, the ALJ

2   determined:

> In activities of daily living, the claimant has mild restriction.  Although her sister doe [sic] her hair, the claimant does the remainder of her own grooming.  She reported to Dr. Torrez that she made her own bed and folded her clothes. . . .
>
> In social functioning, the claimant has moderate difficulties.  The claimant reported during consultative evaluation with Dr. Torrez that she was not looking for worked [sic] but wanted to go to school.  She goes to the store every day and is able to ride public transportation to get around. . . .
>
> With regard to concentration, persistence or pace, the claimant has moderate difficulties.  The claimant testified that she was able to obtain her GED and complete one year of college.  She enjoys crossword puzzles and watching television.  On examination with Dr. Perrine, the claimant's attention and concentration was good and comprehension was within normal range. . . .
>
> As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration.
>
> Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

16   (AT 20.)

17   Plaintiff contends, for several reasons, that the record evidence shows that she has

18   marked difficulties in (1) activities of daily living, (2) maintaining social functioning, and

19   (3) maintaining concentration, persistence, or pace.  (Pl.'s Mot. for Summ. J. 20-24.)

20   First, plaintiff contends that Dr. Onate's opinion supports a finding that plaintiff

21   has marked difficulties with respect to all three of the above categories.  However, for the

22   reasons discussed above, the ALJ properly discounted Dr. Onate's opinion.  Moreover, Dr.

23   Onate never assessed plaintiff's ability to perform activities of daily living.  Additionally, with

24   respect to plaintiff's social functioning, Dr. Onate found that plaintiff had a fair ability to interact

25   with both coworkers and supervisors (AT 381), indicating that plaintiff's impairment in this

26   respect was moderate, rather than marked.

18

1    Second, plaintiff argues that the treatment records support a finding that she had

2    "marked" impairments with respect to all three categories.  (Pl.'s Mot. for Summ. J. 20-24.)  The

3    undersigned addresses plaintiff's assertions with respect to each category in turn.

4    In arguing that she had marked difficulties in activities of daily living, plaintiff

5    cites to the low GAF scores that Drs. Rajappa and Franklin gave plaintiff during her respective

6    appointments with them.  (Id.)  However, a low GAF score does not determine disability; it is a

7    piece of evidence that is to be considered with the rest of the evidence in the record.  Olds v.

8    Astrue, 2008 WL 339757, at *4 (D. Kan. Feb. 5, 2008).  As defendant points out, a GAF score

9    also considers non-medical factors and does not necessarily mean that the severity requirements

10   of a mental disorder listing were satisfied.  65 Fed. Reg. 50746-01, 50765 (Aug. 21, 2000)

11   ("[The GAF Scale] does not have a direct correlation to the severity requirements in our mental

12   disorders listings").  Additionally, an ALJ is permitted to discredit a GAF score where it is

13   unsupported by objective evidence.  Clark v. Astrue, 2009 WL 542166, at *6 (C.D. Cal. 2009).

14   Plaintiff's other treating records generally show that she did not have "marked" difficulties in

15   performing daily activities.  For example, the record shows that plaintiff is able to do most of her

16   own grooming, make her own bed, fold her own clothes, go to the store, and pursue hobbies such

17   as doing crossword puzzles.  (See, e.g., AT 272, 316.)  In short, the record as a whole does not

18   show marked limitations in plaintiff's ability to perform daily activities.

19   With respect to social functioning, plaintiff focuses her argument on the findings

20   of Nurse Practitioner ("N.P") Wicks, who saw plaintiff on February 27, 2008.  (AT 299, 307.)

21   However, N.P. Wicks's findings also suggest only moderate difficulties; she noted that plaintiff

22   had only "mild" mood swings and "moderate depression."  (Id.)  Plaintiff also told N.P. Wicks

23   that she wanted to go back to school and denied any thoughts of wanting to hurt others.  (Id.)

24   Plaintiff also contends that her treatment records generally indicate that she has

25   "marked difficulties in maintaining concentration, persistence, or pace."  (Pl.'s Mot. for Summ.

26   J. 23-24.)  To the contrary, there are several treatment records generally showing that plaintiff

1   was attentive, alert, had a normal ability to concentrate, and made good eye contact. (AT 305-07,

2   309, 315, 366.)

3          Finally, plaintiff argues that her sister's statements and her own testimony

4   illustrate that she has marked limitations with respect to activities of daily living and social

5   functioning.  (Pl.'s Mot. for Summ. J. 20-22.)  However, the ALJ determined that plaintiff's

6   statements regarding the extent of her symptoms and functional limitations were not entirely

7   credible, and plaintiff's briefing does not provide any substantive analysis challenging the ALJ's

8   credibility determinations.  (AT 22.)  Plaintiff also argues that her sister's statements "establish

9   that [plaintiff] has isolated herself from society only going out for treatment."  (Pl.'s Mot. for

10  Summ. J. 22.)  However, as discussed above, the weight of the record evidence, including the

11  opinion evidence and plaintiff's treatment records, indicates that plaintiff's impairments were not

12  nearly as severe.  The ALJ properly relied on this other substantial evidence to determine that

13  plaintiff was at most only moderately impaired.  See Sprague, 812 F.2d at 1229-30.

14         The ALJ also addressed whether plaintiff satisfied the requirements of Paragraph

15  C, stating:

16         In this case, the evidence fails to establish the presence of the "paragraph
           C" criteria.  The claimant does not require a highly structured and
17         supportive environment for adequate functioning.  She has not had
           repeated extended episodes of decompensation.  In addition, a minimal
18         change in the claimant's environment would not be expected to result in
           deterioration in her condition or decompensation.  Moreover, the claimant
19         is not totally unable to function outside the home independently.

20  (AT 20.)

21         Again, the record evidence generally shows that plaintiff could take public

22  transportation on her own, was able to go to the store and anger management meetings, and that

23  she desired to return to school.  (See, e.g., AT 272, 299, 316.)  The record also shows that

24  plaintiff has never been committed to an institution, and has been hospitalized for her conditions

25  only once, in 2007, and only for a short period of time, when plaintiff was not taking medication.

26  (AT 236.)  As discussed above, the remainder of the treatment records indicate that plaintiff's

20

conditions have generally improved and have been well controlled on medication.  See Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits").  Thus, the ALJ reasonably concluded that plaintiff does not satisfy the Paragraph C criteria.

Based on the foregoing, the undersigned concludes that the ALJ did not err in finding that plaintiff's impairments do not meet or equal Listing 12.04.

### 2.   Listing 12.03

Plaintiff asserts that she also meets the criteria under Listing 12.03 for schizophrenic, paranoid, and other psychotic disorders.  (Pl.'s Mot. for Summ. J. 25-26.)  While the ALJ did not specifically address whether plaintiff's impairments meet the criteria set out in Listing 12.03, he generally found that plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments . . . ." (AT 19.)  In any event, plaintiff's argument is without merit.  The criteria required to meet Listing 12.03 substantively mirror the criteria for Listing 12.04, with the only difference being the particular mental impairment in question.  See 20 C.F.R. Pt. 404, Subpt. P, App.1, §§ 12.03-12.04.  Because the symptoms and limitations arising from plaintiff's mental impairments do not satisfy Listing 12.04, they also do not satisfy Listing 12.03.

### C.   Whether The ALJ Improperly Assessed Plaintiff's RFC

Plaintiff argues that the ALJ erred in determining plaintiff's RFC.  (Pl.'s Mot. for Summ. J. 26.)  More specifically, she argues that the ALJ erroneously relied on the opinions of Drs. Perrine and Torrez and wrongfully rejected Dr. Onate's opinion and plaintiff's treatment records.  (Id.)  However, because the undersigned has already concluded that the ALJ properly considered the opinion evidence, plaintiff's argument is without merit.

////

////

1         D.     <u>Whether The Appeals Council Erred By Refusing To Remand To The ALJ For</u>

2                 <u>Reconsideration Based On Plaintiff's Newly-Submitted Medical Evidence</u>

3         The record contains additional evidence that plaintiff submitted to the Appeals

4    Council after the ALJ issued his decision, consisting of seven pages of medical records from

5    August 2009 through February 2010, from the Primary Care Clinic with which Dr. Onate was

6    associated.  (AT 382-89.)  With respect to this evidence, the Appeals Council stated that it had

7    "considered" it, but found that it did "not provide a basis for changing" the ALJ's decision.  (AT

8    1.)  Plaintiff argues that the Appeals Counsel erred in failing to remand her case to the ALJ on

9    the basis of this additional evidence.  (Pl.'s Mot. for Summ. J. 29.)

10        The decision of the ALJ remains the final decision when the Appeals Council

11   denies review.  <u>Russell v. Brown</u>, 856 F.2d 81, 83-84 (9th Cir. 1988).[9]  However, any additional

12   evidence considered by the Appeals Council in denying the request for review becomes part of

13   the administrative record for review by this court.  <u>See</u> <u>Ramirez v. Shalala</u>, 8 F.3d 1449, 1452

14   (9th Cir. 1993); <u>see</u> <u>also</u> <u>Harman v. Apfel</u>, 211 F.3d 1172, 1179-80 (9th Cir. 2000) (the court

15   may properly consider the additional materials because the Appeals Council addressed them in

16   the context of denying appellant's request for review).  To justify a remand based on additional

17   evidence submitted to the Appeals Council, the claimant must show that the evidence is material,

18   i.e., that there is a reasonable possibility that the evidence would have changed the outcome of

19   the administrative hearing.  <u>Mayes v. Massanari</u>, 276 F.3d 453, 462 (9th Cir. 2001).

20        Plaintiff argues that the additional evidence presented in this case was material

21   because it "supported the Medical Source Statement of Dr. Onate by providing medical records

22   of the treatment that he and his staff provided to Plaintiff from 8/19/09 through 2/18/10."  (Pl.'s

23   Mot. for Summ. J. 29.)  As an initial matter, the court observes that these records could not have

24

25        [9]  Only if the Appeals Council <u>grants</u> review and then issues a decision on the merits does
the Appeals Council's decision become the final decision of the Commissioner.  <u>Russell</u>,

26   856 F.2d at 83-84.

1   supported Dr. Onate's August 24, 2009 assessment, because the only record that predates that

2   assessment was an August 19, 2009 intake record completed by someone other than Dr. Onate

3   (AT 388), and the post-August 24, 2009 examinations logically could not have lent support to

4   his conclusory August 24, 2009 assessment.

5          Furthermore, after reviewing the additional treatment records in conjunction with

6   the other record evidence, the undersigned cannot conclude that there is a reasonable possibility

7   that the additional records would have changed the ultimate non-disability determination.  Notes

8   from plaintiff's visits in the second half of 2009 tend to indicate that plaintiff's impairments did

9   not cause the serious limitations that Dr. Onate assessed in his August 24, 2009 form.  For

10  instance, during the appointment on September 28, 2009, it was noted that plaintiff "feels that

11  medication has helped her.  Still has [hallucinations], but says that this has improved over last

12  month."  (AT 385.)

13         Although the two treatment records from 2010 indicate that plaintiff's condition

14  may have declined, Dr. Onate's notes from both of these appointments also indicate that plaintiff

15  had run out of certain medications that she was taking to control her impairments.  (AT 383-84.)

16  As discussed above, the records from plaintiff's other treating sources generally showed that

17  plaintiff's impairments were well-controlled when she was on medication and that her condition

18  would decline when she ran out of certain medications.  (AT 236, 239, 241, 266, 300, 304, 366.)

19  See Warre, 439 F.3d at 1006.  Moreover, the two treatment records from 2010 post-date the

20  Commissioner's final decision and thus do not fall within the relevant period under review.  If

21  plaintiff's impairments truly worsened after the ALJ's final decision, that may be grounds for a

22  new application, but it does not compel a remand with respect to the period at issue in this

23  action.

24  ////

25  ////

26  ////

1    Accordingly, plaintiff has failed to show that the additional evidence submitted to

2  the Appeals Council was material and thus her request for remand on the basis of Appeals

3  Council error is without merit.[10]

4  IV.    <u>CONCLUSION</u>

5    Accordingly, IT IS HEREBY ORDERED that:

6    1. Plaintiff's motion for summary judgment or remand (Dkt. No. 15) is DENIED.

7    2. The Commissioner's cross-motion for summary judgment (Dkt. No. 16) is

8  GRANTED.

9    3. Judgment is entered for the Commissioner.

10    4. The Clerk of Court is directed to close this case.

11  DATED: November 13, 2012

14  _____
15  KENDALL J. NEWMAN
   UNITED STATES MAGISTRATE JUDGE

---

22    [10] Defendant also contends that plaintiff failed to show good cause as to why the
additional evidence was not submitted to the ALJ in the first instance. (Def.'s Cross-Mot. for
23  Summ. J. 15.) Specifically, defendant argues that plaintiff fails to explain why she did not
submit the additional medical records that predated the ALJ's decision to the ALJ. (<u>Id.</u>) The
24  Ninth Circuit Court of Appeals has not decided whether a showing of good cause is required to
remand a case based on evidence first presented to the Appeals Council. <u>See</u> <u>Lewis v. Astrue</u>,
25  2012 WL 1022219, at *11 (W.D. Wash. March 5, 2012) (citing <u>Mayes</u>, 276 F.3d at 461-62).
However, the undersigned finds that resolution of that issue is unnecessary here, because
26  plaintiff failed to show that the new evidence submitted to the Appeals Council was material.